UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NO SPRAY COALITION, INC., et al.,

      Plaintiffs,      00 Civ. 5395 (GBD)

 -against-          MEMORANDUM OPINION
                  & ORDER

THE CITY OF NEW YORK, et al.,

      Defendants.
------------------------------------------------------------x
GEORGE B. DANIELS, DISTRICT JUDGE:

  Plaintiffs bring suit under Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1) alleging that defendants violated the Act by discharging pollutants into the waters in and around New York City without a permit. Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiffs cross-moved for summary judgment. For the reasons stated below, both defendants' and plaintiffs' motions for summary judgment are denied.

## INTRODUCTION

  West Nile Virus ("West Nile") is a mosquito borne virus that can cause serious illness and death. In the late 1990s, several residents of Queens, New York contracted West Nile and fell ill. Shortly thereafter, cases involving West Nile appeared in each borough, causing New York City (the "City") to initiate emergency activities. Specifically, the City, in coordination with the New York State Department of Health ("DOH"), the New York State Department of Environmental Conservation ("DEC"), the United States Environmental Protection Agency ("EPA") and the Federal Center for Disease Control and Prevention ("CDC"), responded to the outbreak by instituting a spraying program to combat the spread of the mosquitoes that carried the virus. The pesticides were sprayed by helicopter and truck throughout parts of the five

boroughs. West Nile has reappeared each summer since 1999, and each year the City renews its program to combat the mosquitoes.

Plaintiffs, a collection of non-profit organizations and individuals opposed to the City's spraying program, brought suit seeking to enjoin the City from conducting its program. In No Spray Coalition v. The City of New York, 2000 WL 1401458 (S.D.N.Y. Sept. 25, 2000), the District Court denied plaintiffs' request for a preliminary injunction and dismissed plaintiff's claims under the Resource Conservation and Recovery Act ("RCRA") and the State and City Environmental Quality Review Acts ("EQRA"). The court did not rule on plaintiff's claims under the Clean Water Act ("CWA" or "the Act"), opting to "leave for another day the question of whether the spraying of insecticides directly over the rivers, bays, sound and ocean surrounding New York City as part of a prevention program would violate the Clean Water Act." Id. at *4. The Second Circuit affirmed the District Court's dismissal of plaintiff's RCRA and EQRA claims. See No Spray Coalition v. The City of New York, 252 F.3d 148 (2d Cir. 2001). The District Court permitted discovery to proceed on plaintiffs' claims that the City *directly* applied the insecticides to protected waters in violation of the CWA.[1]

Plaintiffs thereafter moved for summary judgment, seeking a declaration that defendants violated Section 301(a) of the CWA by discharging pollutants from helicopters and trucks into the navigable waters of the United States without either a National Pollution Discharge Elimination System ("NPDES") permit or a State Pollution Discharge Elimination System

---

[1] In No Spray Coalition v. The City of New York, 2000 WL 1401458, the District Court addressed the issue of whether *incidental drift* of a pesticide into navigable waters constituted a violation under the CWA, finding that "[i]t would be stretching the language of the statute well beyond the intent of Congress to hold that the *de minimus* incidental drift over navigable waters of a pesticide is a discharge from a point source into those waters." Id. at *3.

("SPDES") permit. Defendants cross-moved for summary judgment. The District Court denied plaintiffs' motion and granted defendants' motion, finding that the CWA did not entitle plaintiffs to enforce its provisions by citizen suit. The Court interpreted the Federal Insecticide, Fungicide, and Rodenticide Act's ("FIFRA") non-allowance of enforcement by citizen suit to take precedence over CWA's allowance of enforcement by citizen suit. See No Spray Coalition v. The City of New York, 2002 WL 31682387 (S.D.N.Y. Nov. 26, 2002).

The Second Circuit vacated the district court's opinion and judgment. It ruled that a citizen enforcement suit under the CWA, based on chemicals regulated by FIFRA, could proceed even if the pesticide application alleged to violate the CWA did not also constitute a substantial violation of FIFRA. See No Spray Coalition v. The City of New York, 351 F.3d 602, 604 (2d Cir. 2003). The Second Circuit held that the "CWA authorizes any citizen to bring suit to enforce its requirements, regardless of whether the alleged violation of CWA also constitutes a substantial violation of FIFRA." It remanded the case for further proceedings. The parties now seek to renew their motions for summary judgment.

The parties disagree on two principle issues. Primarily, they disagree as to whether the type of conduct allegedly performed by defendant could constitute a violation of the Clean Water Act. Second, if the acts alleged can constitute a violation of the CWA, the parties dispute whether sufficient evidence has been offered to find, as a matter of law, that defendants in fact did or did not violate the CWA by conducting its spraying program without an NPDES permit.

Plaintiffs argue that defendants' actions are covered by the CWA and that defendants' failure to obtain a permit to spray over water is a violation of the Act. They present evidence that defendants sprayed insecticides *directly* over lakes, streams, ponds and marshes. That evidence

includes: testimony that on one occasion in 1999 and one occasion in 2000, a helicopter spraying over City Island continued to spray over a marina; testimony that a helicopter spraying over Mount Loretto, Staten Island did not turn off its sprayer as it went over the Loretto pond and wetlands; testimony from an employee of one of the contractors used for ground spraying that the spray trucks were tested by turning on the sprayers in the company's lot which was adjacent to the Bronx River, and that he had observed the spray mist from his truck spreading out over various waters as a result of his spraying over land near those waters; spray maps used by the city to designate areas to be sprayed which indicate that spraying was to occur over protected water; interrogatory responses of the New York Police Department that plaintiffs claim confirmed when sprayers were turned off and "establish that helicopters made passes over the designated spray areas with pesticide sprayers turned on"; and evidence of pesticides found in dead fish in Clove Lake in Staten Island. Plaintiffs seek a finding that defendants violated the Act based on the legal argument that a permit was required, and the proffered evidence that defendants sprayed pesticides directly over the water. Defendants dispute much of this evidence.

It is undisputed that defendants had neither a NPDES nor SPDES permit to spray pesticides directly over the water.[2] They argue, however, that the City's spraying program does

---

[2] In 2000, the DEC stated that the City's request to apply pesticides in areas adjacent to wetlands was exempt from State Environmental Conservation Law Article 24 and 25. Declaration of James R. Miller at 5, ¶ 13. In 2001, 2002 and 2003, the Department of Health and Mental Hygiene of the City of New York ("DOH") applied for and obtained a New York State Environmental Conservation Law Article 24 permit from the DEC, covering spray activities in regulated fresh water wetlands and adjacent areas and all surface water bodies. Pursuant to the permit, the City claims that it observed 100 foot setbacks from fresh water bodies during ground applications and 300 foot setbacks from such areas when sprayed by aircraft. Declaration of Gregory Carmichael at 4, ¶ 12. This state permit has no relation to the federal permitting program and no argument has been made that the state permits exempted defendants from any federal requirements.

4

not constitute the discharge of a pollutant into navigable waters and, therefore, such a permit under the CWA is not required. Moreover, they challenge the sufficiency of plaintiffs' evidence, maintaining that the City adhered to strict guidelines protecting against the direct application of the insecticides to water. Specifically, defendants point to guidelines that established 300 feet setbacks from water for aerial spraying, 150 feet setbacks from tidal water, and 100 feet setbacks from fresh water for ground spraying.

## DISCUSSION

The Clean Water Act is a regulatory statute designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "At the time of its passage, Congress hoped to eliminate the discharge of all pollutants into navigable waters by 1985." Hudson River Fishermen's Assoc. v. City of New York, 751 F.Supp. 1088, 1100 (S.D.N.Y. 1990)(citing 33 U.S.C § 1251(a)(1)). "Although the [CWA] contains the lofty goal of eliminating water pollutant discharges altogether, the regulatory regime it creates requires principally that discharges be regulated by permit, not prohibited outright." Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 486 (2d Cir. 2001). The CWA further establishes a permitting program, the NPDES, which provides for the issuance of permits that allow the holder to discharge pollutants at levels below threshold levels incorporated in the permit. See 33 U.S.C. §§ 1311(a), 1342(a); see also Catskill Mountains, 273 F.3d at 486. State permit programs commonly known as SPDES programs, are required to be at least as restrictive as the EPA's emissions standards. See 33 U.S.C. §1342; see also Hudson River Fishermen's Assoc., 751 F.Supp. at 1100. In New York, the NPDES program is administered by the New York State Department of Conservation ("NYSDEC"). New York's permit program

received the approval of the Administrator of the Environmental Protection Agency in 1973. See id.

The CWA defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Plaintiffs allege that the spraying is a discharge; the trucks and helicopters from which the pesticides are sprayed are point sources; and the pesticides are pollutants that are discharged into waters of the United States. See No Spray Coalition, Inc., 2000 WL 1401458, * 2. Defendants claim that, as a matter of law, the spraying technique they incorporated allowed for atmospheric emissions and not discharges; the helicopters and trucks used to spray the insecticides are not point sources under the CWA; the insecticides used in the spraying program are not pollutants; and that they did not discharge pesticides over or into waters of the United States.

A. Discharges vs. Atmospheric Emissions

Defendants argue that "atmospheric emissions of pesticides do not constitute discharges." Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defendant's Brief") at 2. They contend that the Ultra Low Volume ("ULV") method of application they incorporated released pesticide into "the atmosphere as a mist of fine particles, which remain suspended for several minutes and drift through the air and come into contact with mosquitoes." Defendants' Statement of Material Facts pursuant to Rule 56.1 of the Local Rules ("Defendants' Facts"). Furthermore, they argue that the residual particles of pesticide that may have reached the water were minute and therefore, do not constitute a discharge of a pollutant under the CWA.

Under the CWA, a "discharge of a pollutant" includes "any addition of any pollutant to

navigable waters from any point source." 33 U.S.C. § 1362(12). Thus, in order to determine whether a pollutant was discharged, there must have been "an addition" of a pollutant. Although the statute has not defined "addition," the Second Circuit, in Catskill Mountains, 273 F.3d at 491, adopted the position proffered by the EPA in National Wildlife Federation v. Gorsuch, 693 F.2d 156 (D.C.Cir. 1982) that for there to be an "addition," a "point source must introduce the pollutant into navigable water from the outside world." Catskill Mountains, 273 F.3d at 491(citing Gorsuch, 693 F.2d at 165). The Second Circuit added one caveat, agreeing with the D.C. Circuit's view, which "provided that [the term] outside world is construed as any place outside the particular water body to which pollutants are introduced." Id.

The spraying of pesticides into navigable waters can constitute "an addition" under the CWA. The definition of an addition is simple and plain. An addition is "the action or process of adding something to something else." The New Oxford American Dictionary, 18 (Elizabeth J. Jewell & Frank Abate eds., 2001). The amount that is discharged does not affect a finding that an addition has taken place. Nor does the fact that the pesticide is initially sprayed into the air as a fine mist, if the mist descends downward into the water. Moreover, it is would be unreasonable to distinguish between a sprayer releasing a fine mist pollutant into the atmosphere over the water and a pipe that released the same single flow of pollutant directly into water. Violators of the CWA would then need only to attach an airborne mist blower or hydraulic sprayer to their pipe to discharge a pollutant over the water in order to escape liability or regulation. The spraying of pesticides over navigable water, therefore, can constitute an addition of a pollutant into navigable water.[3]

---

[3] In the United States' Brief as Amicus Curiae in Altman v. Town of Amherst, 47 Fed.App. 62, 2002 WL 31132139 (2d Cir. 2002) ("Altman Amicus Brief"), the U.S. Department

7

B. Point Source

Section 502(14) defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). In determining what can constitute a point source, courts have loosely interpreted this definition. See Hudson River Fishermen's Association, 751 F.Supp. at 1101, n. 26 (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 307-08, 102 S.C. 1798, 1800-01, 72 L.Ed.2d 91 (1982), wherein the Supreme Court upheld the district court's finding that airplanes accidentally or deliberately dropping bombs into the sea, as well as ships firing at marine targets, are point sources within the meaning of the CWA); see also Dague v. City of Burlington, 935 F.2d 1343, 1354 (2d Cir. 1991)(finding that "[t]he definition of a point source is to be broadly interpreted").

Defendants contend that the helicopters and trucks used by the City to conduct its spraying program are not point sources because the City "had the purpose of spraying pesticide into the air, and not the purpose or obvious effect of systematically conveying pesticide into water." Defendants' Memorandum of Law in Support of their Motion for Summary Judgment at 24. Defendants have pointed to no case law, however, to support their claim that the definition of a point source includes an element of intent. Indeed, the Ninth Circuit's decision in League of Wilderness Defenders v. Forsgren, 309 F.3d 1181, 1185 (9th Cir. 2002), although not controlling in this Circuit, lends support to a finding that helicopters and trucks, if used in the manner

---

of Justice's Environment & Natural Resources Division took the position that the use of mist blowers and hydraulic sprayers to spray pesticides in, on, or over waters of the United States constitutes the addition of pesticides to waters of the United States. Id. at 7.

8

alleged, can constitute point sources under the statutory definition. In Forsgren, the Ninth Circuit found that "an airplane fitted with tanks and mechanical spraying apparatus is a discrete conveyance" and held that it could constitute a point source under the CWA. Forsgren, 309 F.3d at 1185 (finding it "clear and unambiguous" that "the statutory definition of point source . . . clearly encompasses an aircraft equipped with tanks spraying pesticide from mechanical sprayers directly over covered waters").

Moreover, in Catskill Mountains, 273 F.3d at 493, the Second Circuit found that in determining whether something is a point source, it is enough that it conveys the pollutants from their original source to the navigable water. Id. (citing United States v. Plaza Health Labs., Inc., 3 F.3d 643, 646 (2d Cir. 1993). If the helicopters and trucks used by the City conveyed pollutants from their original source to the navigable water, they can most certainly constitute point sources under the CWA. See No Spray Coalition, 2000 WL 1401458 at *3 (holding, in dicta, that "the trucks and helicopters used to spray insecticides may be point sources").

C. Pollutants

The parties' main dispute centers on the definition of a 'pollutant.' The CWA defines pollutant to mean

> dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, *chemical wastes*, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water[,]

33 U.S.C. § 1362(6)(emphasis added). The legislative history of the CWA indicates that the term "pollutant" should also be interpreted broadly. See S.Rep. No. 92-414 at 76 (1972), reprinted in 1972 U.S.C.C.A.N. 3668, 3742. However, the term 'chemical waste,' which the parties contend is at issue here, is not defined by the CWA and has not been defined by caselaw.

Plaintiff contends that the pesticides in question are 'chemical waste' and are therefore 'pollutants' under the CWA. Defendants contend that pesticides being properly used for their intended purpose are not chemical waste, and therefore not pollutants.[4]

Defendants further proffer that compliance with FIFRA, upon this factual record, dismisses the need for a requirement to obtain a NPDES permit under the CWA. "FIFRA compliance is not dispositive of Clean Water Act compliance, but it is highly relevant and, in certain circumstances, FIFRA compliance means Clean Water Act compliance." Transcript at 15. However, such an argument is dependent upon strict compliance with FIFRA. The City has not and cannot argue that it had permission to spray pesticides directly into or over the water. Under the New York State permit the City obtained, the City was required to observe specific setbacks from navigable waters when spraying. The heart of the dispute therefore still involves two issues: a factual determination as to whether the City did, in fact, spray pesticides in or over the water; and a legal determination whether this *direct* spraying, accidental or intentional, de minimus or not, constitutes the discharge of a pollutant under the CWA. A review of the factual record, the relevant caselaw and guidance memorandum issued by the EPA supports the conclusion that if the City in fact directly sprayed pesticides into the water, it was required to obtain an NPDES permit to do so. Having no permit under such circumstances, spraying pesticides into the water would be a violation of the CWA.

On June 11, 2003, the EPA released its "Interim Statement and Guidance on Application of Pesticides to Waters of the United States in Compliance with FIFRA" ("Interim Guidance").[5]

---

[4] The City has used three insecticides: malathion (known in the industry as Fyfanon); resmethrin (Scourge); and sumithrin (Anvil).

[5] The Interim Guidance was issued to address the Second Circuit decision in Altman, 47 Fed.Appx. 62, where the Second Circuit discussed whether FIFRA compliance meant

The Interim Guidance outlined the EPA's position as to the definition of 'chemical waste.'

> EPA does not believe that pesticides applied consistent with FIFRA are "chemical wastes." The term "waste" ordinarily means that which is eliminated or discarded as no longer useful or required after the completion of a process" . . . . Pesticides applied consistent with FIFRA are not such wastes; on the contrary, they are EPA-evaluated products designed, purchased and applied to perform their intended purpose of controlling target organisms in the environment.

Id. (internal citations and quotations omitted). The Interim Guidance distinguishes between pesticides applied and used in accordance with their government approval, i.e., in compliance with FIFRA, which are not chemical wastes and therefore do not require an NPDES permit, and the discharge of pesticide residues after they have been used, which are considered chemical waste and therefore require a permit.[6]

---

compliance under the CWA. Upon review of the District Court's dismissal of plaintiff's claims, the Second Circuit found that fact issues remained as to whether the pesticides were properly used and whether they were "pollutants" under the CWA. The Court did not take a position on the issue of whether FIFRA compliance equates to CWA compliance, but rather sought from the EPA "a clear interpretation of current law -- among other things, whether properly used pesticides released into or over waters of the United States can trigger the requirement for NPDES permits." The Second Circuit further posited that "[p]articipation by the EPA in this litigation in any way that permits articulation of the EPA's interpretation of the law in this situation would be of great assistance to the courts." Id.

     The Interim Guidance also seeks to address the Ninth Circuit's findings in Headwaters, Inc. v. Talent Irrigation District, 243 F.3d 526 (9th Cir.2001) where the court held that the registration and labeling of pesticides under FIFRA does not preclude the need for a permit under the CWA. "The label's general rules for applying the herbicide must be observed under FIFRA, but where the herbicide will enter waters of the United States, FIFRA provides no method for analyzing the local impact and regulating the discharge from a particular point source. The NPDES permit requirement under the CWA thus provides the local monitoring that FIFRA does not." Id. The court highlighted that "FIFRA registration is a cost-benefit analysis that no unreasonable risk exists to man or the environment taking into account the economic, social, and environmental costs and benefits of the use of any pesticide," Id. at 532 (citing Save Our Ecosystems, 747 F.2d 1240, 1248 (9th Cir. 1984), while "the granting of a NPDES permit under the CWA is not based on a cost-benefit analysis, but rather on a determination that the discharge of a pollutant satisfies the EPA's effluent limitations, imposed to protect water quality." Id. (citing 33 U.S.C. § 1342(a)).

     [6] Although the Interim Guidance was not subject to the procedures of notice and comment rulemaking that warrant deference pursuant to Chevron, U.S.A. v. Natural Resources

11

The City relies on the Interim Guidance for the proposition that their spraying of pesticides in the instant manner was done in compliance with FIFRA and therefore does not require an NPDES permit. This argument, however, is faulty for two reasons. First, the factual record does not support a finding, as a matter of law, that the City complied with the FIFRA labeling requirements of the specific pesticides in question. The FIFRA labels on the Fyfanon ULV states "[t]his product is toxic to fish. Keep out of lakes, streams, ponds, tidal marshes and estuaries." Plaintiffs' Motion for Summary Judgment, Exhibit 52. The Anvil 10+10 ULV label states "[f]or terrestrial uses, do not apply directly to water, or to areas where surface water is present or to intertidal areas below the mean high water mark." Id., Exhibit 54. Lastly, the Scourge label reads "[t]his product is toxic to fish and birds. For terrestrial uses, do not apply directly to water, or to areas where surface water is present or to intertidal areas below the mean high water mark." Id., Exhibit 56. Furthermore, the Interim Guidance is limited to two sets of circumstances that are not present here: (1) FIFRA approved application of pesticides *directly to waters* of the United States in order to control pests; (2) FIFRA approved application of pesticides to control *pests that are present over waters* of the United States *that results in a*

---

Defense Council, 467 U.S. 837, 104 S.Ct. 2778 (1984)(recognizing that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer and that the principle of deference should be applied to administrative interpretations), the Interim Guidance is to be afforded consideration as reasonable and persuasive. "The weight accorded documents of this type when advanced for the purpose of statutory interpretation will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." League of Wilderness Defenders,309 F.3d at 1189 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). The Supreme Court reaffirmed the holding in Skidmore, finding that "interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision [in Skidmore], but only to the extent that those interpretations have the 'power to persuade.'" Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

*portion of the pesticides being deposited into waters* of the United States.

The City does not argue that it sprayed directly over the water to control mosquitos present there. Indeed, by the City's own admission, they were required to adhere to strict New York State guidelines in applying these pesticides. The New York State Environmental Conservation Law Article 24 permit from the DEC, which the City applied for and received in 2001, 2002, and 2003, specifically mandated that the City observe 100 feet setbacks from fresh water bodies during ground applications and 300 feet setbacks from such areas when sprayed by aircraft. Declaration of Gregory Carmichael at 4, ¶ 12. The circumstances covered by the Interim Guidance, therefore, do not apply to the City's spraying. The City not only disputes that it sprayed pesticides over the water, its state regulated authorization to spray clearly prohibited such spraying of pesticides over the water. Therefore, any argument that compliance with FIFRA dispenses with any requirement to obtain a NPDES permit under the CWA is unavailing to defendants in support of their summary judgment motion. It is factually disputed whether the City sprayed in or over water, and such spraying would not be consistent with, or in compliance with, its FIFRA permit to spray over land.

The Interim Guidance's definition of waste as "that which is eliminated or discarded as no longer useful or required after the completion of a process" provides a useful starting point in analyzing whether the pesticides used by the city are 'chemical wastes.' Interim Guidance (citing The New Oxford American Dictionary 1905 (Elizabeth J. Jewell & Frank Abate eds., 2001)). This definition finds support in the Second Circuit's decision that affirmed the Court's earlier decision in this case. In affirming the District Court's dismissal of plaintiffs' claims under the RCRA, the Second Circuit found that

> [t]he district court did not abuse its discretion in denying injunctive relief. Plaintiffs

> argue that once pesticides are sprayed onto or into the air, land, and waters of New York City, they become discarded solid wastes within the meaning of RCRA § 1004(27). But we have indicated that material is not discarded until after it has served its intended purpose. We therefore agree with the district court that the pesticides are not being discarded when sprayed into the air with the design of effecting their intended purpose: reaching and killing mosquitos and their larvae.

No Spray, 252 F.3d at 150 (internal citations and quotations omitted). Under this definition, spraying pesticide over land to kill mosquitos in compliance with its FIFRA permit is not the discharge of a pollutant. However, pesticides sprayed by the City over water can be considered 'chemical waste' if they were either eliminated or discarded while no longer serving its useful and authorized purpose of killing mosquitos over land. Under such circumstances, if FIFRA does not authorize the spraying of pesticide over water, then authorization under the CWA is required in order to do so.

The two sets of circumstances offered by the EPA support this definition. Quite simply, if the City followed the FIFRA labels on the pesticides that warned against direct spraying over the water, the City would not have sprayed directly over the water, and therefore would not require a NPDES permit under the CWA. In order for a pesticide to be considered a 'chemical waste,' it must no longer serve its purpose when discharged, and is therefore eliminated as no longer useful or required. Viewed in this manner, the pesticides used by the City in their spraying program cannot be considered 'chemical waste' if they were serving their purpose and were being sprayed over land to reach and kill mosquitos and their larvae. However, if plaintiffs are correct, and it is factually determined that the City is also further discarding unused pesticides over and into navigable waters, the City can be found to have violated the CWA by conducting its spraying program without the required NPDES permit. The City did not have permission to spray pesticides directly over or into the water under any state or federal law. If the City did

14

discard the pesticides over water, it did so in contravention of the CWA. Such activity would constitute a discharge of a pollutant into navigable waters from a point source, and cannot be done without a NPDES permit.

## CONCLUSION

Disputed issues of material fact exist as to whether defendants discharged a pollutant from a point source into navigable waters without a permit.[7] Both plaintiffs' and defendants' motions for summary judgment are therefore denied.

Dated: New York, New York
June 7, 2005

SO ORDERED:

*[signature: George B. Daniels]*
GEORGE B. DANIELS
United States District Judge

---

[7] The parties do not dispute whether the waters where the pesticides were allegedly deposited were navigable waters under the CWA. The Second Circuit has construed "navigable waters" to include non-navigable tributaries of navigable waterways, including small streams. See No Spray Coalition v. The City of New York, 351 F.3d at 604. Furthermore, "[i]n issuing permits, EPA and state governments either may establish national or statewide caps for cumulative discharge of specific pollutants from all regulated sources, or may proceed on a case-by-case basis, taking into account the ecological conditions of particular waterways." Id.

15